# BOARD OF PARDONS ET AL. *v.* ALLEN ET AL.

No. 86–461.   Argued April 1, 1987—Decided June 9, 1987

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 381.

*Clay R. Smith*, Assistant Attorney General of Montana, argued the cause for petitioners. With him on the briefs was *Michael T. Greely*, Attorney General.

*Stephen L. Pevar* argued the cause for respondents. With him on the brief were *Edward I. Koren, Elizabeth Alexander*, and *Alvin J. Bronstein.**

JUSTICE BRENNAN delivered the opinion of the Court.

The question presented is whether respondents have a liberty interest in parole release that is protected under the Due Process Clause of the Fourteenth Amendment.

I

Respondents are George Allen and Dale Jacobsen, inmates of the Montana State Prison.[1] In 1984, after their applica-

---

*Randall D. Schmidt* filed a brief for Eugene Newbury as *amicus curiae* urging affirmance.

*Dennis E. Curtis, Judith Resnik, William J. Genego, John L. Pottenger, Jr.*, and *Stephen Wizner* filed a brief for the Yale Law School Legal Services Organization et al.

[1] Both respondents were released on parole after this suit was filed. 792 F. 2d 1404, 1408, n. 2 (1986). The action is not moot, however. In addition to requesting injunctive and declaratory relief, the complaint sought damages from Henry Burgess, Chair of the Board of Pardons, in

tions for parole were denied, they filed this action pursuant to 42 U. S. C. § 1983 on behalf of a class of all present and future inmates of the Montana State Prison who were or might become eligible for parole. Seeking declaratory and injunctive relief, as well as compensatory damages, the complaint charged the State Board of Pardons (Board) and its Chair with violations of the inmates' civil rights. Specifically, respondents alleged that the Board does not apply the statutorily mandated criteria in determining inmates' eligibility for parole, Complaint ¶¶ 6–9, App. 5a–6a, and that the Board does not adequately explain its reasons for denial of parole, *id.*, ¶¶ 9, 10, App. 6a.[2]

The District Court first acknowledged that the case was controlled by the principles established in this Court's decision in *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1 (1979). In *Greenholtz* the Court held that, despite the necessarily subjective and predictive nature of the parole-release decision, see *id.*, at 12, state statutes may create liberty interests in parole release that are entitled to protection under the Due Process Clause. The Court concluded that the mandatory language and the structure of the Nebraska statute at issue in *Greenholtz* created an "expectancy of release," which is a liberty interest entitled to such protection. *Ibid.*

---

both his official and personal capacities. Because "this Court has not decided whether state parole officials enjoy absolute immunity as a matter of federal law," *Cleavinger* v. *Saxner*, 474 U. S. 193, 200 (1985), "the validity of respondents' claim for damages . . . is not so insubstantial or so clearly foreclosed by prior decisions that this case may not proceed." *Memphis Light, Gas & Water Division* v. *Craft*, 436 U. S. 1, 8–9 (1978).

[2] Of the 350 individuals released from prison in Montana in 1985, 276 were conditionally released, the vast majority of them on parole; only 74 persons released had served their full sentences. See U. S. Dept. of Justice, Bureau of Justice Statistics, Prisoners in State and Federal Institutions on December 31, 1985, Table 43 (1985). Only 69 of 363 released in 1984 had discharged their full sentences. See U. S. Dept. of Justice, Bureau of Justice Standards, Prisoners in State and Federal Institutions on December 31, 1984, Table 13 (1984).

Although the District Court recognized that the Montana statute, like the Nebraska statute in *Greenholtz*, contained language mandating release under certain circumstances, it decided that respondents "were not entitled to due process protections in connection with the board's denial of parole." App. 17a. The court concluded that, because the Board is required to make determinations with respect to the best interest of the community and the prisoner, its discretion is too broad to provide a prisoner with a liberty interest in parole release.

The Court of Appeals reversed. It compared the provisions of the Montana statute to those of the Nebraska statute in *Greenholtz* and found their structure and language virtually indistinguishable:

> "The Montana statute, like the Nebraska statute at issue in *Greenholtz*, uses mandatory language. It states that the Board 'shall' release a prisoner on parole when it determines release would not be harmful, unless specified conditions exist that would preclude parole. There is no doubt that it, like the Nebraska provision in *Greenholtz*, vests great discretion in the Board. Under both statutes the Board must make difficult and highly subjective decisions about risks of releasing inmates. However, the Board may not deny parole under either statute once it determines that harm is not probable." 792 F. 2d 1404, 1406 (CA9 1986).

The court thus held that respondents had stated a claim upon which relief could be granted, and remanded the case to the District Court for consideration of "the nature of the process which is due [respondents]" and "whether Montana's present procedures accord that due process." *Id.*, at 1408.

We granted certiorari, 479 U. S. 947 (1986), and now affirm.

## II

*Greenholtz* set forth two major holdings. The Court first held that the presence of a parole system by itself does not give rise to a constitutionally protected liberty interest in parole release.[3] The Court also held, however, that the Nebraska statute did create an "expectation of parole" protected by the Due Process Clause. 442 U. S., at 11. To decide whether the Montana statute also gives rise to a constitutionally protected liberty interest, we scrutinize it under the standards set forth in *Greenholtz.*

The Nebraska statute involved in *Greenholtz* provides as follows:

---

[3] There is far more to liberty than interests conferred by language in state statutes. See *Hewitt* v. *Helms,* 459 U. S. 460, 466 (1983); *Connecticut Board of Pardons* v. *Dumschat,* 452 U. S. 458, 468 (1981) (WHITE, J., concurring). Four Members of this Court are of the view that the existence of a liberty interest in parole release is not solely a function of the wording of the governing statute. See *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S., at 18 (POWELL, J., concurring in part and dissenting in part) ("I do not believe, however, that the application of the Due Process Clause to parole-release determinations depends upon the particular wording of the statute governing the deliberations of the parole board"); *id.,* at 22 (MARSHALL, J., with BRENNAN and STEVENS, JJ., dissenting in part) ("*[A]ll* prisoners potentially eligible for parole have a liberty interest of which they may not be deprived without due process, regardless of the particular statutory language that implements the parole system"). At stake in the parole-release decision is a return to freedom, albeit conditional freedom; liberty from bodily restraint is at the heart of the liberty protected by the Due Process Clause. Thus, inmates may have a liberty interest in parole release "derived solely from the existence of a system that permit[s] criminal offenders to serve their sentences on probation or parole." *Id.,* at 24–25 (MARSHALL, J., dissenting in part); see also *id.,* at 19 (POWELL, J., concurring in part and dissenting in part) ("[W]hen a state adopts a parole system that applies general standards of eligibility, prisoners justifiably expect that parole will be granted fairly and according to law whenever those standards are met").

We proceed, however, to apply the Court's analysis in *Greenholtz,* because it too necessitates the conclusion that Montana inmates have a liberty interest in parole release.

"Whenever the Board of Parole considers the release of a committed offender who is eligible for release on parole, it *shall* order his release unless it is of the opinion that his release should be deferred because:

"(a) There is a substantial risk that he will not conform to the conditions of parole;

"(b) His release would depreciate the seriousness of his crime or promote disrespect for law;

"(c) His release would have a substantially adverse effect on institutional discipline; or

"(d) His continued correctional treatment, medical care, or vocational or other training in the facility will substantially enhance his capacity to lead a law-abiding life when released at a later date." Neb. Rev. Stat. § 83-1,114(1) (1981) (emphasis added).

The statute also sets forth a list of 14 factors (including one catchall factor permitting the Nebraska Board to consider other information it deems relevant) that the Board must consider in reaching a decision. §§ 83-1,114(2)(a)-(n).

In deciding that this statute created a constitutionally protected liberty interest, the Court found significant its mandatory language—the use of the word "shall"—and the presumption created—that parole release must be granted unless one of four designated justifications for deferral is found. See *Greenholtz*, 442 U. S., at 11-12.[4]

The Court recognized—indeed highlighted—that parole-release decisions are inherently subjective and predictive, see *id.*, at 12, but nonetheless found that Nebraska inmates

---

[4] Cf. *Hewitt* v. *Helms, supra,* at 471-472. In that case the Court held that Pennsylvania's administrative segregation statutes and regulations created a protected liberty interest in remaining in the general prison population. The Court relied on the State's use of "language of an unmistakably mandatory character" and its specification of "substantive predicates" to confinement—"the need for control," or "the threat of a serious disturbance."

possessed a liberty interest in release. The Court observed that parole release is an equity-type judgment involving "a synthesis of record facts and personal observation filtered through the experience of the decisionmaker and leading to a predictive judgment as to what is best both for the individual inmate and for the community," *id.*, at 8,[5] and acknowledged that the Nebraska statute, like most parole statutes, "vest[ed] very broad discretion in the Board," *id.*, at 13. Nevertheless, the Court rejected the Board's argument "that a presumption [of release] would be created only if the statutory conditions for deferral were essentially factual, . . . rather than predictive." *Id.*, at 12.

The Court thus held in *Greenholtz* that the presence of general or broad release criteria—delegating significant discretion to the decisionmaker—did not deprive the prisoner of the liberty interest in parole release created by the Nebraska statute. In essence, the Court made a distinction between two entirely distinct uses of the term discretion. In one sense of the word, an official has discretion when he or she "is simply not bound by standards set by the authority in question." R. Dworkin, Taking Rights Seriously 32 (1977). In this sense, officials who have been told to parole whomever they wish have discretion. In *Greenholtz*, the Court determined that a scheme awarding officials this type of discretion does not create a liberty interest in parole release. But the term discretion may instead signify that "an official must use judgment in applying the standards set him [or her] by authority"; in other words, an official has discretion when the standards set by a statutory or regulatory scheme "cannot be applied mechanically." Dworkin, *supra*, at 31, 32; see also *id.*, at 69 ("[W]e say that a man has discretion if his duty is

---

[5] See also *Greenholtz*, *supra*, at 10 (quoting Kadish, The Advocate and the Expert—Counsel in the Peno-Correctional Process, 45 Minn. L. Rev. 803, 813 (1961)) ("The decision turns on a 'discretionary assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may become rather than simply what he has done'").

defined by standards that reasonable [people] can interpret in different ways"). The Court determined in *Greenholtz* that the presence of official discretion in this sense is not incompatible with the existence of a liberty interest in parole release when release is *required* after the Board determines (in its broad discretion) that the necessary prerequisites exist.

Throughout this litigation, the Board's arguments have had a single theme: that the holding of the Court of Appeals is inconsistent with our decision in *Greenholtz*.[6] The Board is mistaken. The Montana statute, like the Nebraska statute, creates a liberty interest in parole release. It provides in pertinent part:

> "Prisoners eligible for parole. (1) Subject to the following restrictions, the board *shall* release on parole . . . any person confined in the Montana state prison or the women's correction center . . . when in its opinion there is reasonable probability that the prisoner can be released without detriment to the prisoner or to the community[.]
>
> .　　　.　　　.　　　.　　　.
>
> "(2) A parole shall be ordered only for the best interests of society and not as an award of clemency or a reduction of sentence or pardon. A prisoner shall be placed on parole only when the board believes that he is able and willing to fulfill the obligations of a law-abiding

---

[6] See Pet. for Cert. 8 ("Reasons for Granting the Writ[:] The Court of Appeals' Opinion Clearly Misconstrues *Greenholtz*"); Brief for Petitioners 10 (The conclusion that respondents had no protected liberty interest under the Montana statute "is consistent with, and required by, *Greenholtz*"); *id.*, at 11 ("The Court of Appeals' opinion deviates from *Greenholtz*, as well as from related decisions, and must therefore be reversed"); Reply Brief for Petitioners 3, n. 1 ("The parties . . . have not urged abandonment of *Greenholtz*, but rather have contended that it is consonant with their respective positions").

citizen." Mont. Code Ann. § 46–23–201 (1985) (emphasis added).[7]

Significantly, the Montana statute, like the Nebraska statute, uses mandatory language ("shall")[8] to "creat[e] a presumption that parole release will be granted" when the desig-

---

[7] This section also provides that

"(a) No convict . . . may be paroled until he has served at least one-half of his full term, . . . except that a convict designated as a nondangerous offender . . . may be paroled after he has served one-quarter of his full term . . . . Any offender serving a time sentence may be paroled after he has served . . . 17½ years.

"(b) No convict serving a life sentence may be paroled until he has served 30 years . . . ." Mont. Code Ann. § 46–23–201 (1985).

[8] Cf. *Grifaldo* v. *State*, 182 Mont. 287, 596 P. 2d 847 (1979) (Section 46–18–404(1) provides that the sentencing court "shall" designate a defendant a nondangerous offender if either of two conditions are met; this mandatory language entitled the defendants to the designation and the parole-eligibility status that accompanies it).

The Board argues that this Court is bound by statements of the Montana Supreme Court that parole is a privilege, a matter of grace, not of right. It is true that a State has no duty to establish a parole system or to provide for parole for all categories of convicted persons, see *Greenholtz*, 442 U. S., at 7, and that a State may place conditions on parole release; only in this sense is parole a privilege, not a right. None of the Montana cases cited by the Board decide whether parole release is mandatory for an eligible inmate upon a finding that the statutory prerequisites have been met. See *Cavanaugh* v. *Crist*, 189 Mont. 274, 615 P. 2d 890 (1980) (upholding the constitutionality of a statute authorizing a sentencing judge to forbid parole release of certain offenders); *Lopez* v. *Crist*, 176 Mont. 352, 578 P. 2d 312 (1978) (allowing the Board to keep a defendant whose parole had been wrongfully revoked in custody for up to 30 days to devise an acceptable new parole plan, because the Board has a statutory duty to impose and supervise conditions of parole); *In re Frost*, 146 Mont. 18, 403 P. 2d 612 (1965) (finding no blanket entitlement to parole after serving statutory *minimum* period); *In re Hart*, 145 Mont. 203, 399 P. 2d 984 (1965) (permitting the reincarceration of a defendant who ignored the conditions of his parole); *State ex rel. Herman* v. *Powell*, 139 Mont. 583, 367 P. 2d 553 (1961) (finding that the Board has no right to extinguish a sentence by paroling an individual on a subsequent sentence); *Goff* v. *State*, 139 Mont. 641, 367 P. 2d 557 (1961) (finding that the inmate was not denied equal protection because his codefendant was paroled before he was).

nated findings are made. *Greenholtz*, 442 U. S., at 12.[9] See Statement of Assistant Attorney General of Montana, Tr. of Oral Arg. 6 ("under our statute once the Board of Pardons determines that the facts underlying a particular parole application are such that the release can occur consistently with the three criteria the statute specifies, then under our law the Board is required to order release"). We reject the argument that a statute that mandates release "unless" certain findings are made is different from a statute that mandates release "if," "when," or "subject to" such findings being made. Any such statute "creates a presumption that parole release will be granted." *Greenholtz, supra*, at 12.[10]

---

[9] The District Court found significant that, while the statute at issue in *Greenholtz* lists 14 factors that the Nebraska Board is obligated to consider in making the designated findings, the Montana statute "lists no factors required to be considered by the parole board." App. 17a. In Montana, however, the Board considers these same 14 factors, which are set forth in the Board's regulations. See Administrative Rules of Montana § 20.25.505 (1980). This Court, and the Courts of Appeals, see n. 10, *infra*, have recognized the relevance of regulations to a determination of whether a certain scheme gives rise to a liberty interest. See *Hewitt* v. *Helms*, 459 U. S., at 470–471; see also *Connecticut Board of Pardons* v. *Dumschat*, 452 U. S., at 467 (BRENNAN, J., concurring in judgment). In addition, the Montana statute does *obligate* the Board to consider certain information in making its parole-release decision. See Mont. Code Ann. § 46–23–202(1) (1985) ("[T]he board shall consider . . . the circumstances of his offense, his previous social history and criminal record, his conduct, employment, and attitude in prison, and the reports of any physical and mental examinations which have been made").

[10] As JUSTICE WHITE has pointed out, the Circuits have split on the question whether the absence of mandatory language creating a presumption of release precludes a finding that a statute or regulation creates a liberty interest. See *Anderson* v. *Winsett*, 449 U. S. 1093 (1981) (WHITE, J., dissenting from denial of certiorari). But, as the following analysis of the decisions of the Courts of Appeals demonstrates, even under the most "restrictive interpretation of *Greenholtz*," *Baumann* v. *Arizona Department of Corrections*, 754 F. 2d 841, 844 (CA9 1985), courts have held that the presence of mandatory language in the statute gives rise to a liberty interest in parole release. The Montana statute, by its use of the word "shall"

Moreover, the "substantive predicates," see *Hewitt* v. *Helms*, 459 U. S. 460, 472 (1983), of parole release in Montana are similar to those in Nebraska. In both States, the

and the phrase "[s]ubject to the following restrictions," creates a liberty interest under this most restrictive interpretation.

Courts of Appeals' decisions since *Greenholtz* fall into four categories. When statutes or regulatory provisions are phrased in mandatory terms or explicitly create a presumption of release, courts find a liberty interest. See *Parker* v. *Corrothers*, 750 F. 2d 653, 661 (CA8 1984) (Arkansas regulation); *Mayes* v. *Trammell*, 751 F. 2d 175, 178 (CA6 1984) (Tennessee Board of Parole Rule); *Williams* v. *Missouri Board of Probation and Parole*, 661 F. 2d 697, 698 (CA8 1981) (Missouri statute), cert. denied, 455 U. S. 993 (1982). Conversely, statutes or regulations that provide that a parole board "may" release an inmate on parole do not give rise to a protected liberty interest. See *Dace* v. *Mickelson*, 797 F. 2d 574, 576 (CA8 1986) (South Dakota statute); *Parker* v. *Corrothers, supra*, at 657 (Arkansas statute); *Gale* v. *Moore*, 763 F. 2d 341, 343 (CA8 1985) (amended Missouri statute); *Dock* v. *Latimer*, 729 F. 2d 1287, 1288 (CA10 1984) (Utah statute); *Irving* v. *Thigpen*, 732 F. 2d 1215, 1216 (CA5 1984) (Mississippi statute); *Candelaria* v. *Griffin*, 641 F. 2d 868, 869 (CA10 1981) (New Mexico statute); *Williams* v. *Briscoe*, 641 F. 2d 274, 276 (CA5) (Texas statute), cert. denied, 454 U. S. 854 (1981); *Schuemann* v. *Colorado State Board of Adult Parole*, 624 F. 2d 172, 174 (CA10 1980) (Colorado statute); *Shirley* v. *Chestnut*, 603 F. 2d 805, 806–807 (CA10 1979) (Oklahoma statute); *Wagner* v. *Gilligan*, 609 F. 2d 866, 867 (CA6 1979) (Ohio statute). A third type of statute provides that an individual shall *not* be released *unless* or shall be released *only when* certain conditions are met; courts have divided on whether such statutes create a liberty interest. Most courts have found that such statutes set forth criteria that *must* be met before release, but that they do not *require* release if those findings are made. See *Patten* v. *North Dakota Parole Board*, 783 F. 2d 140, 142 (CA8 1986) (North Dakota statute); *Huggins* v. *Isenbarger*, 798 F. 2d 203, 204–205 (CA7 1986) (Indiana statute); *Berard* v. *State of Vermont Parole Board*, 730 F. 2d 71, 75 (CA2 1984) (Vermont statute); *Thomas* v. *Sellers*, 691 F. 2d 487, 488 (CA11 1982) (Alabama statute); *Staton* v. *Wainwright*, 665 F. 2d 686, 688 (CA5 1982) (Florida statute); *Jackson* v. *Reese*, 608 F. 2d 159, 160 (CA5 1979) (Georgia statute); *Boothe* v. *Hammock*, 605 F. 2d 661, 664 (CA2 1979) (New York statute); but see *United States ex rel. Scott* v. *Illinois Parole and Pardon Board*, 669 F. 2d 1185, 1188 (CA7 1982) (Illinois statute). Yet a fourth type of analysis finds a liberty interest when a statute or a regulatory parole-release scheme uses elaborate and explicit guidelines to struc-

Parole Board must assess the impact of release on both the prisoner and the community. A central concern of each is the prisoner's ability "to lead a law-abiding life." Neb. Rev. Stat. § 83–1,114(1)(d) (1981); see § 83–1,114(1)(a) (prisoner may not be released if there is "a substantial risk that he will not conform to the conditions of parole"); Mont. Code Ann. § 46–23–201(2) (1985) (prisoner *must* be released when, *inter alia*, it will cause no detriment to him or her and *must not* be released unless the prisoner is "able and willing to fulfill the obligations of a law-abiding citizen"). An interrelated concern of both statutes is whether the release can be achieved without "detriment to . . . the community." Mont. Code Ann. § 46–23–201(1) (1985); see § 46–23–201(2) (prisoner must be released only "for the best interests of society"); see Neb. Rev. Stat. § 83–1,114(1)(b) (1981) (prisoner must not be released if it "would depreciate the seriousness of his crime or promote disrespect for law"). The discretion left with the parole boards is equivalent in Montana and Nebraska.

The legislative history further supports the conclusion that this statute places significant limits on the discretion of the Board. The statute was enacted in 1955, replacing a 1907 statute which had granted absolute discretion to the Board:

"*Parole of prisoners in State Prison.* —The Governor may recommend and the State Board of Prison Commissioners may parole any inmate of the State Prison, under such reasonable conditions and regulations as may be deemed expedient, and adopted by such state board." Mont. Rev. Code § 9573 (1907).

The new statute made release mandatory upon certain findings and specified its purpose in its title: "An Act Creating a Board of Pardons and Prescribing the Appointment and Composition Thereof, With Power and *Duty* to Grant Pa-

---

ture the exercise of discretion. See *Dace* v. *Mickelson, supra,* at 577–578 (South Dakota regulations); *Green* v. *Black,* 755 F. 2d 687, 688 (CA8 1985) (Missouri policy statement); *Winsett* v. *McGinnes,* 617 F. 2d 996, 1007 (CA3 1980) (Delaware regulations), cert. denied 449 U. S. 1093 (1981).

roles, *Within Restrictions . . . .*" Act of Mar. 3, 1955, 1955 Mont. Laws, ch. 153 (emphasis added). The new statute also added a provision for judicial review of the Board's parole-release decisions, see Mont. Code Ann. § 46–23–107 (1985), thus providing a further indication of a legislative intent to cabin the discretion of the Board.

Here, as in *Greenholtz*, the release decision is "necessarily subjective . . . and predictive," see 442 U. S., at 13; here, as in *Greenholtz*, the discretion of the Board is "very broad," see *ibid.*; and here, as in *Greenholtz*, the Board *shall* release the inmate when the findings prerequisite to release are made. See *supra*, at 377–378 and 379–380. Thus, we find in the Montana statute, as in the Nebraska statute, a liberty interest protected by the Due Process Clause. The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

Relying on semantics and ignoring altogether the sweeping discretion granted to the Board of Pardons by Montana law, the Court today concludes that respondents had a legitimate expectation of parole sufficient to give rise to an interest protected by procedural due process. Because I conclude that the discretion accorded the Board of Pardons belies any reasonable claim of *entitlement* to parole, I respectfully dissent.

In *Board of Regents* v. *Roth*, 408 U. S. 564 (1972), this Court observed that to have a protected interest, one "clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.*, at 577. Applying these principles, the *Roth* Court found that a teacher had no property interest in a renewal of his 1-year contract despite the fact that most teachers hired on a year-to-year basis by the university were rehired. *Id.*, at 578, n. 16. The Court concluded that the teacher had no legitimate entitlement to continued employment because the

discretion of the university officials to renew or not renew such a contract was subject to no "cause" limitations.

The *Roth* decision teaches that a mere expectation of a benefit—even if that expectation is supported by consistent government practice—is not sufficient to create an interest protected by procedural due process. Instead, the statute at issue must create an entitlement to the benefit before procedural due process rights are triggered. In my view, the distinction between an "entitlement" and a mere "expectancy" must necessarily depend on the degree to which the decisionmakers' discretion is constrained by law. An individual simply has nothing more than a mere hope of receiving a benefit unless the decision to confer that benefit is in a real sense channeled by law. Because the crucial inquiry in determining the creation of a protected interest is whether a statutory *entitlement* is created, it cannot be sufficient merely to point to the existence of some "standard." Instead, to give rise to a protected liberty interest, the statute must act to limit meaningfully the discretion of the decisionmakers. In the administrative law context we have long recognized that some purported standards "'are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park* v. *Volpe*, 401 U. S. 402, 410 (1971) (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). Accordingly, we have held that some agency action is committed to agency discretion within the meaning of the Administrative Procedure Act; as a result, agency action is not subject to judicial review if "no judicially manageable standards are available for judging how and when an agency should exercise its discretion." *Heckler* v. *Chaney*, 470 U. S. 821, 830 (1985). It is no less critical in determining whether a statute creates a protected liberty interest to consider whether the statute includes standards that place real limits on decisionmaker discretion.

Under our precedents, an entitlement is created by statute only if "particularized standards or criteria" constrain the

relevant decisionmakers. *Connecticut Board of Pardons* v. *Dumschat*, 452 U. S. 458, 467 (1981) (BRENNAN, J., concurring). In *Meachum* v. *Fano*, 427 U. S. 215 (1976), for example, we concluded that a state statute did not create a liberty interest in remaining in a particular penal facility because that statute "conferred no right on the prisoner to remain in the prison to which he was initially assigned, defeasible only upon proof. of *specific* acts of misconduct." *Id.*, at 226 (emphasis added). The broad discretion granted prison officials to make transfer decisions negated any claim to the creation of a liberty interest:

> "A prisoner's behavior may precipitate a transfer; and absent such behavior, perhaps transfer would not take place at all. But, as we have said, Massachusetts prison officials have the discretion to transfer prisoners for any number of reasons. Their discretion is not limited to instances of serious misconduct. As we understand it no legal interest or right of these respondents under Massachusetts law would have been violated by their transfer whether or not their misconduct had been proved in accordance with procedures that might be required by the Due Process Clause in other circumstances. Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all." *Id.*, at 228.

See also *Olim* v. *Wakinekona*, 461 U. S. 238, 249 (1983) ("[A] State creates a protected liberty interest by placing substantive limitations on official discretion"); *Hewitt* v. *Helms*, 459 U. S. 460, 472 (1983) (observing that the statute in question provided "explicitly mandatory language in connection with requiring *specific* substantive predicates") (emphasis added); *Montanye* v. *Haymes*, 427 U. S. 236, 243 (1976) (no liberty interest in remaining in particular facility created by state

law because state law did not limit transfer only on the occurrence of misconduct); *Wolff* v. *McDonnell,* 418 U. S. 539, 557 (1974) ("[T]he State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior").

Although paying lipservice to the principle that a statute creates an entitlement sufficient to trigger due process protections only when the decisionmakers' discretion is limited by standards, the Court today utterly fails to consider whether the purported "standards" *meaningfully* constrain the discretion of state officials. Even a cursory examination of the Montana statute reveals that the Board of Pardons is subject to no real restraint, and that the standards are anything but "particularized." In sharp contrast to the statute at issue in *Wolff* v. *McDonnell, supra,* and like the statutes at issue in *Meachum* v. *Fano, supra,* and *Montanye* v. *Haymes, supra,* the Montana statute does not require specific acts of misconduct before the Board may deny parole. Instead, the Board may deny parole when it determines: that there is not a "reasonable probability that the prisoner can be released without detriment to the prisoner or to the community," Mont. Code Ann. § 46–23–201(1) (1985); that parole is not in "the best interests of society," § 46–23–201(2); *or* that the Board believes that the prisoner is not "able and willing to fulfill the obligations of a law-abiding citizen." *Ibid.* An appellate court reviewing the decision of the Board that the release of a prisoner would not be "in the best interests of society" or would be "detriment[al] . . . to the community" would have little or no basis for taking issue with the judgment of the Board. These broadly framed standards essentially leave the decision whether or not to grant release on parole to the discretion of the Board, and therefore the statute simply fails to create a legitimate entitlement to release. See Herman, The New Liberty: The Procedural Due Process Rights of Prisoners and Others Under the Burger Court, 59 N. Y. U. L. Rev. 482, 550 (1984) ("A parole statute providing

that parole shall be granted unless the prospective parolee 'poses a danger to society' is not significantly different from one under which the parole board's decisions are nonreviewable, since a court would be unlikely to reverse a parole board decision made under such a discretionary standard").

Admittedly, the statute at issue in *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1 (1979), did not offer "particularized" standards, and did not significantly restrain the parole decision. *Greenholtz* is thus an aberration and should be reexamined and limited strictly to its facts. Nonetheless, in marked contrast to the Montana statute, at least the Nebraska statute limited to some degree the scope of the factors that parole officials could consider dispositive in granting or denying release on parole. While the Montana statute permits denial of parole when the prisoner's release is not in "the best interests of society" or is "detriment[al] to the prisoner or to the community," the Nebraska statute permits consideration only of four more focused factors: (1) whether "there is a substantial risk that [the prisoner] will not conform to the conditions of parole," (2) whether the "release would depreciate the seriousness of [the] crime or promote disrespect for law," (3) whether the "release would have a substantially adverse effect on institutional discipline," and (4) whether the prisoner's "continued correctional treatment, medical care, or vocational or other training in the facility will substantially enhance [the prisoner's] capacity to lead a law-abiding life." Neb. Rev. Stat. § 83–1,114(1) (1981). Therefore, the result in this case is not compelled by *Greenholtz*, even assuming that case was correctly decided.

In sum, the Court has abandoned the essential inquiry in determining whether a statute creates a liberty interest. Instead of requiring particularized standards that actually constrain the discretion of the relevant decisionmakers, the Court is satisfied simply by the presence of a purported "standard." Because I find the Court's approach at odds with our liberty interest jurisprudence, I dissent.